# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL L. GARCIA, a minor,<br>by through his Guardian ad Litem,<br>ANGEL CHAPARRO,<br><br>                Plaintiff,<br><br>   v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of Social Security,<br><br>                Defendant. | 1:09-cv-01107 GSA<br><br>ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |

## **BACKGROUND**

Plaintiff Michael L. Garcia ("Michael"), by and through his guardian ad litem Angel Chaparro (hereinafter referred to as "Ms. Chaparro"), seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for child's supplemental security income, pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

///
///
///
///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 12 & 14.

1

**FACTS AND PRIOR PROCEEDINGS[2]**

Ms. Chaparro filed an application for benefits on February 14, 2006. AR 101-107. After being denied both initially and upon reconsideration, Ms. Chaparro requested a hearing before an Administrative Law Judge ("ALJ"). AR 82-85, 87-90. ALJ James Berry held a hearing on April 3, 2008. AR 44-68. The ALJ issued a decision denying benefits on May 29, 2008. AR 14-25. On May 1, 2009, the Appeals Council denied review. AR 1-3.

**Hearing Testimony**

ALJ Berry held a hearing on April 3, 2008, in Fresno, California. Michael was present for the hearing. Ms. Chaparro, Michael's mother, his stepfather Anthony Chaparro and his grandmother Elizabeth Serrato testified at the hearing. AR 44-46.

Michael was born on November 8, 1998, and was nine years old at the time of the hearing. AR 49. He had just started the third grade and was taking regular classes. AR 49.

Michael has a history of hyperactivity and behavioral problems that began prior to kindergarten. AR 49. In kindergarten, Michael would run from the classroom, prompting the principal and teachers to give chase. AR 49. Occasionally he would run to his older brother's classroom where he would "flip everybody off." AR 49-50. In an effort to avoid being returned to the classroom, Michael would "hold onto a tree." AR 50. Michael's grandmother indicated he would often throw temper tantrums in her care and refuse to attend school. Michael's tantrums have included attempting to exit a moving vehicle and showering with his clothes on. AR 61-62. On one occasion, Michael's grandmother had to "hold [Michael] down on the floor" to keep him from running away. AR 62. On another occasion, Michael threatened to tell the police that his mother was trying to kill him with a knife. AR 62-63.

The Chaparros were convinced by school officials to hold Michael back a year; however, when he later returned to school, Michael's behavior had worsened. AR 50. For example, Michael hit other children, and failed to listen, sit still, pay attention or obey commands. AR 50. The Chaparros were often called to pick Michael up from school after these incidents, and

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

occasionally Michael was suspended from school.  AR 50.  According to Ms. Chaparro, Michael was "hardly ever in school" during the second grade.  AR 50.

Michael's behavior has also included kicking his mother and grandmother, damaging his grandmother's property, and running away from home.  AR 50.  Michael was once found by police after having escaped the Chaparro home through a window, prompting intervention by Child Protective Services ("CPS").  CPS advised Ms. Chaparro that Michael should receive mental health treatment.  AR 50-51, 59.  There have been other incidents involving Michael and calls to the police for assistance.  AR 59, 62-63.

The Chaparros have heard Michael talking to himself, primarily when he is alone.  AR 52, 60.  He has nightmares wherein people are trying to kill him or Ms. Chaparro.  Michael told his mother "that he has two brains and one of them tells him to do bad things and the other one tries to fight it but [Michael] says the one that tells him to do bad things is stronger than the one . . . trying to do good."  AR 52.

Following a mental evaluation, Michael was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and bipolar disorder.  AR 52.  After initially refusing a course of treatment involving medication, the Chaparros agreed that Michael could be placed on prescription medication to treat his mental disorders.  This decision was made after Michael was expelled from all schools within the district.  AR 55, 57-58.  Michael was prescribed Concerta and continues to take the medication in a greater dosage than that initially prescribed.  He becomes defiant and argumentative when his medication wears off in the evenings.  AR 52-53, 58.  Michael has received mental health counseling and remains under a doctor's care.  AR 55.

Michael often fights with his brothers and sisters.  He is too rough, and "doesn't know how to play with them," and before long his younger siblings are crying.  AR 53-54.  Ms. Chaparro's oldest son has indicated that the children in the neighborhood do not want to play with Michael.  AR 54.

School officials recently advised Ms. Chaparro that Michael is "pushy" and remains argumentative, nevertheless, once Michael began taking the prescription medication his overall behavior has improved.  AR 55, 66-67.  Ms. Chaparro acknowledged that homework remains a

problem because Michael does not complete the homework, nor does he turn it in as assigned. AR 56-57.

### Medical Record

*Sonia Sahai-Bains, M.S.*

In May 2005, Michael was seen by Sonia Sahai-Bains, M.S., an unlicensed mental health clinician with the Children's Mental Health Division of the Department of Children and Families. AR 170. Ms. Sahai-Bains noted Michael had often pushed, hit, and kicked others in class. AR 170. She also noted that CPS became involved because Michael ran away from home. AR 170. Ms. Chaparro told Ms. Sahai-Bains that Michael played with fire, specifically, lighting his teddy bear on fire in the fireplace and almost causing the hallway to catch on fire. AR 170. In addition, Michael had hallucinations where he would imagine two people sitting in a room trying to kill his mother. AR 170. Michael wakes up in the middle of the night sweating but Ms. Chaparro did not elaborate on what happened next. AR 170. Also, Ms. Chaparro described Michael as having "two brains," where one controlled the other and made him forget his previous behaviors. AR 170.

Ms. Sahai-Bains opined that Ms. Chaparro "seems to enable [Michael] to not be held accountable [for his] actions." AR 170. Ms. Sahai-Bains noted that Michael's biological father and Ms. Chaparro were back together, and that Michael's father did not tolerate much from Michael. AR 170. Michael's father stated that Michael knew his father's expectations of him and did not "test him" as much. AR 170. Ms. Sahai-Bains diagnosed Michael with Oppositional Defiant Disorder and noted that Michael's Global Assessment of Functioning score was 55.[3] AR 168-169.

Through late May and early June 2005, Ms. Sahai-Bains' notes indicate Ms. Chaparro's failure to show up for an appointment and subsequent scheduling conflicts. AR 165-167. On June 14, 2005, Ms. Sahai-Bains noted that Ms. Chaparro had missed two appointments and

---

[3] The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's overall level of functioning. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV"). A GAF between 51 and 60 indicates "[moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). DSM- IV at 34.

4

attempts to contact her were unsuccessful. AR 163-164. A letter was sent to Ms. Chaparro advising that Michael's case had been closed. AR 164.

### *2005-2006 Student Conduct Referrals*

From August 24, 2005 to February 9, 2006, numerous student conduct referrals concerning Michael's behavior were completed. AR 177-182. The conduct included: stealing, arguing with teachers, throwing tantrums, pushing others, running away, cussing and inappropriate gestures, and inappropriate play activity. AR 177-182. Michael's parents were often called and Michael was sent home. AR 177-182. On occasion, Michael was suspended. AR 177-182.

### *Ekram Michiel, M.D.*

On April 29, 2006, Michael was seen by board certified psychiatrist Ekram Michiel. AR 183-185. Dr. Michiel noted that Ms. Chaparro felt Michael could not be around people and threw tantrums whenever he was around them. AR 183. Ms. Chaparro reported that she was called every day to pick Michael up from school due to his behavior, ultimately forcing Ms. Chaparro to quit her day job as a counselor for a residential care treatment facility. AR 183. Michael's behavior led to his expulsion from kindergarten, and subsequent suspensions. AR 183.

During the examination, Dr. Michiel noted that Michael paced nonstop, and was very talkative, "especially to himself." AR 184. In addition, Michael refused to answer Dr. Michiel's questions. AR 184. Michael did not listen, and it was difficult to get his attention or make him focus. AR 184. According to Ms. Chaparro, Michael's hyperactivity and attention deficit disorder may be hereditary because one of his uncles exhibits the same symptoms. AR 183. Ultimately, Dr. Michiel diagnosed Michael with ADHD, and assigned a GAF score of 65.[4] AR 184.

---

[4] The DSM-IV-TR states a GAF score from 61-70 indicates: "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

Dr. Michiel believed Michael was capable of handling daily life activities, but that Michael needed to continue "psychotherapy to build up his social skills." AR 184. Dr. Michiel opined that Michael's psychotherapy should include medication to treat ADHD. AR 184.

### *Central Unified School District Notices of Suspension*

From August 2006 to February 2007, Michael was often disciplined for fighting, chasing other children, disobeying teachers, disrupting school activities, and calling people names. AR 139-150. Michael was sent home numerous times, and was also placed on suspension. AR 139-150. Counseling was recommended. AR 142, 144, 146, 148.

More specifically, on October 26, 2006, Michael was placed on suspension for damaging personal property and defying authority. AR 142. The school principal reported that Michael received counseling every Monday, however, he recommended counseling "above and beyond what the school can offer." AR 142. Michael and Anthony Chaparro signed a Student Accountability Monitoring ("SAM") agreement wherein Michael acknowledged his behavior needed to improve, and that his frequent defiance of authority, bullying, and intimidation towards other students has not changed despite school counseling. AR 143. The agreement stipulated that Michael would be automatically suspended for future bullying, intimidating others, or for defying adults. AR 143. The agreement also stated that a recommendation of expulsion or alternative placement would occur upon Michael's nineteenth suspension. AR 143.

Michael received his twentieth notice of suspension on February 5, 2007, when he disrupted school activities and defied authority. AR 139. He also willfully used force on another person. AR 139. On February 7, 2007, Michael's vice principal wrote a letter to Ms. Chaparro, requesting her presence at a hearing to determine whether the suspension would be extended. AR 138. Ultimately, Michael was voluntarily transferred to an independent study program until April 16, 2007. AR 137.

### *E.A. Murillo, M.D.*

On August 2, 2006, E.A. Murillo, a state agency, non-examining physician, opined that Michael had an impairment or combination of impairments that were severe, but did not meet, medically equal, or functionally equal the listings. AR 195. Specifically, Dr. Murillo assigned

no limitation to Michael in acquiring and using information, moving about and manipulating objects, or health and physical well-being. AR 197-198. The doctor assigned Michael "less than marked" limitations in attending and completing tasks, and in caring for self. AR 197-198. Dr. Murillo assigned Michael a "marked" limitation with regard to interacting and relating with others. AR 197-198.

*Fresno County Mental Health*

From August 30, 2006 to December 13, 2006, Michael was treated at the Fresno County Department of Children and Family Services, Division of Children's Mental Health. AR 201-225. Siacha Vang, M.S.W., noted that Michael was overly active, unable to sit still, easily distracted, and was impulsive and restless everyday. AR 217. In addition, it was noted that Michael talks back and argues with adults, and does not follow rules. AR 217. Ms. Vang's summary references the following behavior: Michael's aggressiveness; problems completing homework; running away from home; setting fires in the backyard, kitchen and living room; and nightmares. AR 217. She opined that Michael had a "[p]robability of significant impairment" in social support and daily activities. AR 220. Ms. Vang determined that Michael was not a risk to himself or others, and recommended Michael receive a referral to outpatient services. AR 221.

On November 18, 2006, Michael, his parents, and licensed therapist Paul Phipps, entered into a Plan of Care to reduce Michael's physical aggression, defiant behavior, and ADHD symptoms. AR 207. The plan called for twelve months of individual and collateral therapy to achieve these goals. AR 207. Michael was late to his first appointment and cancelled two appointments. AR 202, 204-205. During his first appointment, Michael lied about fighting, but later acknowledged he fought at school. AR 205. Michael reported that when he got hit by another student in school, he had difficulty controlling his anger. AR 205. He was too "angry to tell a teacher," and instead responded by fighting back. AR 205. On December 1, 2006, Mr. Phipps noted he and Michael's parents would work more closely with the school to set a more structured environment because Michael was still getting into fights at school. AR 203.

On February 22, 2007, psychiatrist Asha Gaur, M.D., examined Michael and opined that Michael had a mood disorder but did not rule out bipolar disorder, ADHD, or oppositional

defiant disorder.  AR 295-298.  Dr. Gaur's evaluation noted that Michael was alert, displayed normal speech, cognition and average intelligence, was pleasant and cooperative throughout the evaluation, and had a "fair" attention span, but was impulsive and easily distracted.  AR 297.  Dr. Gaur recommended a mood stabilizer or stimulant to treat ADHD symptoms.  AR 298.  However, the doctor noted that Michael's parents "did not want to consider medication at [that] time."  AR 298.

On April 16, 2007, Dr. Gaur recommended a stimulant be prescribed.  AR 291.  In the event Michael did not improve, a mood stabilizer could be prescribed.  AR 291.  On May 9, 2007, Dr. Gaur prescribed eighteen milligrams of Concerta.  AR 290.  On or around August 10, 2007, the Concerta dosage was increased to twenty seven milligrams after Anthony Chaparro advised that the original dosage did not seem to help any longer.  AR 282.  On September 13, 2007, Mr. Chaparro reported Michael's behavior improved with the increase in dosage.  AR 275.

On November 8, 2007, Linda Edhere-Ekezie, M.D., examined Michael.  AR 258.  His mother reported he was doing well, but in the prior week Michael had shoved another child and was still argumentative in school and at home.  AR 258.  Michael's mother reported his academics were improving, and Michael was able to sit and do his school work.  AR 258.  She reported Michael was still having problems having social interactions outside of his home, but he had a "good number" of friends.  AR 258.  Dr. Ekezie opined that Michael displayed cooperative behavior, normal cognition, an organized thought process and average intelligence; however, she found Michael's insight and judgment impaired.  AR 258.

On January 9, 2008, Ms. Chaparro stated Michael was improving but was still having behavioral problems.  AR 247.  Dr. Gaur opined that Michael had impaired insight and judgment.  AR 247.  The doctor increased Michael's dosage to thirty-six milligrams.  AR 247.  On January 23, 2008, Ms. Chaparro stated Michael was still experiencing behavioral problems, however his teachers were calling the Chaparro home less frequently.  AR 245.  Ms. Chaparro also stated that when Michael gets angry, he screams and his tantrums last for thirty minutes.  AR 245.

*Teacher Questionnaire*s

Michael's first grade teacher completed a questionnaire reporting that Michael had no problems in acquiring and using information, or moving about and manipulating objects.[5] AR 187-194.  In the domain of attending and completing tasks, the teacher noted Michael had "serious" problems with waiting to take turns, changing from one activity to another without being disruptive, and working without distracting himself or others.  AR 189.  She noted Michael had "slight" and "obvious" problems in other areas such as paying attention when spoken to directly, focusing long enough to finish assigned tasks, refocusing to task when necessary, carrying out single and multi-step instructions, organizing things, completing assignments thoroughly and accurately, and working at a reasonable pace and/or finishing on time.  AR 189.  The teacher reported Michael needed extra help because he refused to do his work and pay attention; the extra help was not necessary because he lacked ability.  AR 189.

With regard to interacting and relating with others, the teacher noted Michael had a "serious" problem with seeking attention appropriately.  AR 190.  She also noted Michael had "obvious" problems playing cooperatively with other children, expressing anger appropriately, following rules, and respecting/obeying adults in authority.  AR 190.  It was noted Michael had "slight" problems in "caring for yourself," such as handling frustration appropriately, being patient when necessary, responding appropriately to changes in mood, and using appropriate coping skills to meet daily demands of school environment.  AR 192.

On January 16, 2007, Michael's second grade teacher, Monica Rivera, completed a questionnaire indicating Michael had a problems in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself.  AR 232-236.  She reported no problems regarding manipulation or movement of objects.  AR 235.  More specifically, in the acquiring and using information category, Ms. Rivera noted Michael had a "serious" problem with reading and comprehending written material.  Other key activities in this category were identified as "no problem" or a "slight problem" for Michael.  AR 232.  Additionally, Ms. Rivera noted Michael had "low attention," was easily frustrated, and

---

[5] The questionnaire is neither signed nor dated.

aggravated others by touching them.  AR 232.  Under the category of attending and completing tasks, Ms. Rivera noted that Michael had "very serious" problems in waiting to take turns, changing from one activity to another without being disruptive, organizing his own things or school materials, and working without distracting himself or others.  AR 233.  He also had "serious" problems in refocusing to task when necessary, completing class and/or homework assignments, and working at a reasonable pace and/or finishing on time.  AR 233.

With regard to interacting and relating with others, Ms. Rivera noted Michael had "very serious" problems in playing cooperatively with other children, making and keeping friends, expressing anger appropriately, and asking permission appropriately.  AR 234.  In addition, Ms. Rivera noted he had "serious" problems in seeking attention appropriately, following rules, and respecting or obeying adults in authority.  AR 234.  She indicated that Michael had been suspended nineteen times due to "extreme aggressiveness or defiance" towards others, but noted that his behavior improved after Christmas.  AR 234.  She also noted that Michael is allowed "down time," or a few moments to compose himself.  AR 234.  This occurs when Michael gets extremely defensive and argumentative when confronted with an issue.  AR 234.

Ms. Rivera noted Michael had "very serious" problems in the caring for self domain, in handling frustration appropriately, being patient when necessary, using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs, responding appropriately to changes in his moods, and using appropriate coping skills to meet daily demands of school environment.  AR 236.  Michael was also noted to have a "serious" problem in knowing when to ask for help.  AR 236.

**R.B. Paxton, M.D.**

On April 3, 2007, R.B. Paxton, a state agency, non-examining physician, reviewed Michael's records, which included both teachers' questionnaires.  AR 239.  Dr. Paxton concluded that Michael's condition was severe, but not disabling.  AR 239.

**Function Report**

In an undated SSA Function Report, Ms. Chaparro reported that Michael's ability to progress in learning was limited.  AR 115.  More particularly, Ms. Chaparro noted that Michael

could not read and understand simple sentences or stories in books, or magazines.  Michael could not write in longhand, spell most three to four letter words, or write a simple story with six to seven sentences.  Additionally, Michael did not know the days of the week and months of the year, understand monetary transactions, nor was he able to tell time.  AR 115.  Ms. Chaparro specifically noted that Michael was "always being kicked out of school for fighting, name calling, [and] being mean to [his] teacher."  AR 115.

Ms. Chaparro also reported that Michael's impairments affected his behavior with other people because Michael had no friends his age, could not make new friends, could not get along with adults and school teachers, and did not play sports.  AR 117.  In addition, Ms. Chaparro reported Michael's impairments affect his ability to take care of his own personal needs, such as brushing his teeth, picking out and hanging up clothes, picking up toys, and helping around the house, obeying parents, observing safety rules, and accepting criticism.  AR 118.

Finally, Ms. Chaparro reported that Michael's ability to pay attention and stick with tasks was limited.  AR 119.  He could not keep busy on his own, finish things that he started, work on arts and crafts projects, complete homework, or do chores.  AR 119.

***Other Records***

From August 2007 to December 2007, Michael's teachers sent daily reports home to the Chaparros.  AR 249-257, 261-274, 279-281.  During this time, his teachers noted that he was working harder in controlling his emotions, and overall his behavior was improving.  AR 249-257, 261-274, 279-281.  However, when Michael did not take his medication, his behavior suffered.  AR 271, 280.

On March 3, 2008, a Student Transition Plan prepared by opportunity program teachers and Michael's parents noted that Michael "responded well to . . . daily communication home regarding his behavior."  AR 242.  Michael had difficulty focusing when he is not on his medication; however, as an intervention, his teachers maintain close contact with his parents to determine whether dosages may have been missed.  AR 242.  Michael's strength was noted to be mathematics, and it was further noted that he was confident with skills he knew well.  AR 242.  Also noted under student strengths, Michael's social interactions with other students were

appropriate. AR 242. His weakness included the comment that he "needs continual encouragement to complete assignments." AR 242-243.

Approximately one month following the hearing before the ALJ, the Appeals Council admitted additional evidence into the record concerning Michael's behavior between the period of March 10, 2008 to May 9, 2008. AR 4. Michael received three referrals for school bus suspension for the following behaviors: disorderly conduct; being boisterous or loud; not remaining seated; sticking arms or body outside windows; fighting or scuffling on the bus; refusing to obey the driver; and violating safety procedures. AR 39-43.

## **SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

The childhood disability standard was changed by the Personal Responsibility and Work Opportunity Act of 1996. *Pub. L. No. 104-193, § 211, 110 Stat. 2105 (1996)*, amending 42 U.S.C. § 1382c(a)(3)(A*)*. The amendment provides:

> [A]n individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked or severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(I).

To apply the new statutory standard, the Commissioner now uses a three-step sequential evaluation procedure for determining whether a child's impairments result in marked and severe functional limitations and is therefore disabled. 20 C.F.R. § 416.924(b)-(d) (2001). The amendment eliminated the fourth step in the disability analysis: determining whether the child had an impairment or impairments of comparable severity to that which would disable an adult. This new standard applies to new claims filed on or after August 22, 1996, and to new claims not yet finally adjudicated on that date. 42 U.S.C. § 1382c. A claim is not finally adjudicated if an administrative or judicial appeal was pending on or after that date regarding a claim that has been denied in whole. *Id.; see Jamerson v. Chater*, 112 F.3d 1064, 1065 n.1 (9th Cir. 1997).

The relevant inquiry at step one is whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If not, step two requires the fact finder to determine whether the child has a medically severe impairment or combination of impairments. 20 C.F.R. § 416.924(c). Ms. Chaparro bears the burden of demonstrating a severe impairment. 20 C.F.R. § 416.924. If the impairment is a "slight abnormality or a combination of slight abnormalities that cause no more than a minimal functional limitation," the Commissioner will find that the child does not have a severe impairment and therefore is not disabled. 20 C.F.R. § 416.924(c).

Step three requires determining whether the severe impairment meets or equals in severity any impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924(d). If such an impairment exists, the Commissioner must find the child disabled. *Id.* If the child's impairment does not meet or medically equal any listing, then the Commissioner must determine if the limitations caused by the impairment functionally equal a listing in the Listing of Impairments. *Id.* To do so, the Commissioner will assess all of the functional limitations caused by the child's impairments in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating

objects; (5) caring for self; and (6) health and physical well being. *See* 20 C.F.R. § 416.926a(a)-(b). To functionally equal a listing, the impairments must result in marked limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a).

Where the final decision of the Commissioner was proper under the old standard, it must be upheld under the new standard, as the new standard is more stringent. *Jamerson v. Chater*, 112 F.3d at 1068.

### *The ALJ's Findings*

Applying the childhood disability standard here, the ALJ found that: (1) Michael did not engage in any substantial gainful activity at any time relevant to the decision because he was a school-age child at the time of filing the claim; (2) Michael has a severe impairment of attention deficit hyperactivity disorder; (3) however, the severe impairment did not medically or functionally equal the listings. AR 17.

More specifically, the ALJ found that Michael had "less than marked" limitations for acquiring and using information, interacting and relating with others, caring for self, and health and physical well-being. AR 20, 22-24. The ALJ noted Michael had no limitation with regard to moving about and manipulating objects. AR 23. Lastly, the ALJ assigned Michael a "marked" limitation in the domain of attending and completing tasks. AR 21.

Because Michael did not have two "marked" limitations in any of the domains, or one "extreme" limitation in a single domain, the ALJ determined that Michael was not disabled. AR 24-25.

## DISCUSSION

### *The Opinion of Non-Examining Physician Murillo*

In his findings, the ALJ summarized the medical evidence. AR 19. In conclusion, the ALJ stated:

> As for the opinion evidence, the State Agency physicians concluded the claimant had no limitations in acquiring and using information, moving about and manipulating objects, and health and physical well-being, *less than marked limitations in attending and completing tasks* and caring for himself or herself, and *marked limitations in interacting and relating with others*. Dr. Michiel believed the claimant needed adjunctive treatment to his psychotherapy in the form of medication to help with his attention and hyperactivity. The claimant would be capable of handling his daily life activities.

AR 19, emphasis added. Next, the ALJ addressed each domain of functioning individually. AR 19-25. The ALJ determined Michael was markedly limited in attending and completing tasks. AR 21.

Plaintiff argues that the "singular issue in this case is whether Michael suffers from an impairment or combination of impairments that is functionally equivalent to the listing of impairments." Doc. 16 at 7. Specifically, Plaintiff argues that the ALJ ignored Dr. Murillo's opinion which gave Michael a "marked" limitation in the domain of interacting and relating with others. *Id*. at 7-8. Furthermore, Plaintiff argues that the ALJ's opinion "only disagrees with Dr. Murillo on the degree of impact, without any statement of reasons why." *Id*. at 8. Thus, Plaintiff alleges the "ALJ erred in failing to facially consider the opinions of Dr. Murillo." *Id*.

With regard to the domain of interacting and relating with others, the ALJ considered the Function Report completed by Ms. Chaparro, in addition to the comments from Michael's first and second grade teachers. AR 22. Plaintiff's argument that the ALJ failed "to facially consider" Dr. Murillo's findings is not persuasive. First, the ALJ expressly noted the opinions of the state agency physicians, including Dr. Murillo, who concluded that Michael suffered a "marked" limitation in the domain of interacting and relating with others. In addition, the ALJ noted Dr. Murillo's conclusion that Michael had a "less than marked" limitation in the domain of attending and completing tasks. In fact, the ALJ noted Dr. Murillo's findings in every domain other than attending and completing tasks. AR 19.

Second, Dr. Murillo's conclusions were properly considered in light of other evidence in the record. The weight given to a non-examining, non-treating physician's opinion cannot, by itself, constitute substantial evidence. *See Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (citing *Gallant v. Heckler*, 753 F.2d 1450, 1454 (9th Cir. 1984) ("A report of a non-examining, non-treating physician should be discounted and is not substantial evidence when contradicted by all other evidence in the record"). Here, the ALJ relied on other evidence in the record, including the Function Report and the teachers' questionnaires. For example, the ALJ quoted Ms. Chaparro's report regarding Michael's inability to make friends, play team sports, or get along with adults and teachers. AR 22; *see also* AR 117. In addition, the ALJ noted the questionnaire

of Michael's first grade teacher who believed that Michael had a "slight problem" in making and keeping friends, asking permission appropriately, and taking turns in a conversation. AR 22; *see also* AR 190. Michael's first grade teacher also opined that Michael had "an obvious problem in playing cooperatively with other children, expressing anger appropriately, following rules, and respecting/obeying adults in authority; and a serious problem in seeking attention appropriately." AR 22; *see also* AR 190.

Plaintiff notes correctly that Dr. Murillo's opinions are supported by Michael's second grade teacher,[6] Monica Rivera, and Michael's academic disciplinary record. The ALJ considered Ms. Rivera's questionnaire:

> [Ms. Rivera] reported the claimant had a slight problem using language appropriate to the situation and listener; an obvious problem relating experiences and telling stories, taking turns in a conversation, using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation; a serious problem in seeking attention appropriately, following rules, and respecting/obeying adults in authority; and a very serious problem in playing cooperatively with other children, making and keeping friends, expressing anger appropriately, and asking permission appropriately. The claimant had been suspended 19 times due to extreme aggressiveness or defiance towards other students and/or adults.

AR 22; *see also* AR 234. Accordingly, Plaintiff argues that the "ALJ must assign weight to the opinions of Dr. Murillo on the deficit in interacting and relating with others." Doc. 16 at 8.

Plaintiff relies upon Title 20 of the Code of Federal Regulations section 416.927(f)(2)(i), which requires an ALJ to consider evidence from non-examining physicians. However, the regulation also states that an ALJ is "not bound by any findings made by State agency medical or psychological consultants," and thus, does not need to rely solely on their opinions to make the "ultimate determination about whether [a claimant is] disabled." 20 C.F.R. § 416.927(f)(2)(i). Because Dr. Murillo's opinion alone is not substantial evidence, the ALJ properly relied on other opinion evidence in the record to determine Michael was not disabled.

---

[6]Information from "other sources," like a claimant's teachers, cannot establish the existence of a medically determinable impairment. Rather, there must be evidence from an "acceptable medical source" for that purpose. SSR 06-3p.

Plaintiff also argues that the "ALJ only disagrees with Dr. Murillo on the degree of impact, without any statement of reasons why" and "is not free to second-guess the professional judgment of the physicians." Doc. 16 at 8. In support of this argument, Plaintiff relies on *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). However, *Clifford* concerned an ALJ's failure to give controlling weight to a claimant's treating physician. Plaintiff's reliance on *Clifford* here is misplaced because Dr. Murillo is not Michael's treating physician.

In addition, Plaintiff inaccurately refers to *Magallanes v. Bowen*, 881 F.2d 747, 752 (9th Cir. 1989), arguing that Dr. Murillo's opinion cannot be rejected in the absence of clear and convincing reasons. Doc. 16 at 8. However, the "clear and convincing" standard only applies to uncontroverted sources, such as treating physicians. *Magallanes*, 881 F.2d at 751. Where, like here, there is a conflict in the medical evidence, the ALJ must weigh all the evidence in the record and make a decision. *Magallanes*, 881 F.2d at 750. This Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Id.* The ALJ weighed the evidence in the record and found that Michael was not disabled. AR 19, 22. This finding is a rational interpretation of the evidence.

It is also important to note that both the ALJ and Dr. Murillo determined that Michael was not disabled because each assigned Michael only one "marked" limitation out of the six domains, albeit in different categories. AR 19- 20; *see also* 20 C.F.R. § 416.926a(d) (finding of disability requires "marked" limitation in two domains, or "extreme" limitation in one domain). No physician found Michael to be markedly impaired in two domains, or extremely limited in a single domain.

Finally, Plaintiff asserts in his reply brief that if the "Commissioner believed that the record before the ALJ had changed materially on the issue of interacting and relating with others, then the ALJ was obligated by agency policy to have another expert consider and comment upon the record." Doc. 18 at 4. Plaintiff cites Social Security Acquiescence Ruling 04-1(9), which states, in relevant part:

> [The ALJ] must make reasonable efforts to ensure that a qualified pediatrician or *other individual* who specializes in a field of medicine appropriate to the disability of the individual . . . evaluates the case of the individual.  To satisfy this requirement, the [ALJ] may rely on case evaluation made by a *State agency*

17

> *medical . . . consultant that is already in the record*, or [a medical expert]. When the ALJ relies on the case evaluation made by a State agency medical . . . consultant, the record must include the evidence of the qualifications of the State agency medical . . . consultant. In any case, the [ALJ] must ensure that the decision explains how the State agency medical . . . consultant's evaluation was considered."

Emphasis added. Notably, Social Security regulations are not binding on the district court. *See Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005). Plaintiff asserts that because the ALJ did not rely on Dr. Murillo's opinion and did not call upon the expertise of a pediatrician or child psychiatrist, the "ALJ accepted the opinion of Dr. Murillo on that specific question as a matter of law." Doc. 18 at 5. Here, the ALJ relied on the opinions of Dr. Murillo and those of other physicians. AR 19; *see also* AR 196. Furthermore, simple conflicts in the record do not require expert evaluation for every discrepancy. As stated earlier, the ALJ has the duty to resolve conflicts within the medical record. *Magallanes*, 881 F.2d at 750. If the record fails to provide a sufficient basis for making a disability determination, or the evidence conflicts to the extent that the ALJ cannot reach a conclusion, he may seek additional evidence from other sources. 20 C.F.R. §§ 404.1512(e) & 404.1527(c)(3); *see also Mayes v. Massanari*, 262 F.3d 963, 968 (9th Cir. 2001). ALJ Berry had no need to obtain the opinion of a pediatrician or other qualified medical professional. The record before ALJ Berry provided a sufficient basis to make a disability determination.

In sum, the ALJ conducted a thorough review of the entire record and thereafter made a disability determination which is supported by substantial evidence and is free of legal error.

//
//
//
//
//
//
//

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Michael L. Garcia, by and through his Guardian ad Litem Angel Chaparro.

IT IS SO ORDERED.

**Dated:   August 6, 2010**          /s/ **Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE